**HAMILTON WEB CO. v. PAGE, Collector of Internal Revenue.**

No. 2509.

District Court, D. Rhode Island.
Oct. 23, 1934.

William A. Needham and James E. Dooley, both of Providence, R. I., for plaintiff.

Henry M. Boss, Jr., U. S. Atty., and Edward F. McElroy, Asst. U. S. Atty., both of Providence, R. I., and E. Barrett Prettyman, General Counsel, and E. T. Kemper, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendant.

LETTS, District Judge.

This is an action brought by Hamilton Web Company, a Rhode Island corporation, against Frank A. Page, as Collector of Internal Revenue for the District of Rhode Island, to recover the sum of $31,945.93. This amount was assessed against the plaintiff as transferee of assets of Hamilton Web Company, a New York corporation. The assessment was based upon alleged deficiency payments by the New York corporation in respect to the years 1917, 1918, and 1919.

The plaintiff was incorporated under the laws of the state of Rhode Island in the spring of 1924, and shortly thereafter, to wit, on April 16, 1924, there were conveyed to it all the assets of Hamilton Web Company, a New York corporation which had been in existence for many years. The officers and stockholders of the newly incorporated Rhode Island corporation were the same as those of the New York corporation, each having the same proportionate stock interest and continuing to carry on the same business.

Shortly after the consummation of the aforementioned transaction, the New York corporation was dissolved and its charter relinquished under the laws of that state. After a lapse of about two years the Commissioner of Internal Revenue sent a so-called sixty-day deficiency letter addressed to Hamilton Web Company, Hamilton, R. I., giving notice of deficiency assessments against the New York corporation for the three years in question in the respective amounts of $4,-865.38, $20,432.44, and $2,848.37. This letter was received by the plaintiff, which filed about two months later, through one of its officers, a "Petition" with the United States Board of Tax Appeals seeking to effect a review of the proposed deficiency assessments (Stipulation of Facts).

In December of 1927, and prior to any hearing before the Board upon this "Petition," a motion in form purporting to be that of the dissolved New York corporation by Hamilton Web Company, a Rhode Island corporation, was filed with the Board asking leave to file an amended petition. This motion was granted, following which another motion in similar form was filed with the Board asking leave to file a revised amended petition. This motion was also granted. While

the matter stood thus, a sixty-day deficiency letter setting up transferee assessments for the years 1917, 1918, and 1919 was received by the plaintiff from the Commissioner of Internal Revenue. No appeal to the Board was taken by the plaintiff as a result of, or in respect to, this proposed assessment.

Following the receipt of this last letter claiming transferee assessments in the amounts above stated, the Commissioner on May 26, 1928, assessed against the plaintiff as transferee certain additional amounts of taxes as due from the New York corporation for said three years, which additional amounts had never been assessed against or claimed as due from the New York corporation prior to its dissolution. These additional assessments increased the sums assessed from $4,865.38 to $5,522.21 for the year 1917, and from $20,432.44 to $23,190.82 for the year 1918, and from $2,848.37 to $3,232.90 for the year 1919, aggregating a total of $31,945.93 which, under protest, was paid by the plaintiff to the defendant in June of 1928.

Nearly two years later, in March of 1930, the Board of Tax Appeals dismissed the revised amended petition for lack of jurisdiction. Reference will again be made to the opinion of the Board filed in support of this dismissal.

In June, following this action by the Board, the plaintiff filed with the defendant claims for refund of the assessments made. These claims were disallowed by the Commissioner in their entirety.

The plaintiff's right to recover involves the consideration of two unrelated issues, and as the facts bearing upon each are so wholly disassociated they can best be separately stated and appraised.

The first contention to be dealt with relates solely to the alleged deficiency taxes assessed in respect to the years 1917 and 1918. It is contended that, if proper allowance be made for capital losses suffered by the New York corporation through obsolescence of certain capital assets, no possible deficiency in the tax paid by the corporation for those years could exist. There would, therefore, be no basis for an assessment against the Rhode Island corporation as transferee.

The New York corporation, from its organization in 1885 until its dissolution in 1924, had been engaged in the manufacture of so-called narrow fabrics. Among its products were fabrics from which were made pull straps, principally used in the manufacture of men's high shoes. Prior to the period of the World War there was an extensive market for this product. Due, however, to the increased use of low shoes, instead of high, beginning with that period and affected also by the purpose of war-time economies in eliminating the use of materials for any unessential feature in manufactured products, the market for narrow fabrics for shoe straps rapidly diminished. Apparently, from an early date during the period that these shoe straps were most used many shoe manufacturers had their own design for the structure of the fabric, including in many cases the name of the manufacturer woven into the fabric. To accomplish this, designs had first to be made and then from these designs large cards, with perforations corresponding to the designs, were made which were utilized in controlling the operation of the Jacquard looms so as to reproduce the desired pattern in the finished product. It appears that the combined cost of preparing each design and corresponding set of cards was approximately $23. The Hamilton Web Company of New York in the conduct of its business over this period had accumulated a large number of these designs and cards, the evidence indicating that there were on hand at the beginning of 1917 approximately 2,400 sets. They had, however, never been carried by the corporation upon its books as a capital asset or investment, the corporation having from the beginning charged off the cost of making the designs and cards as an operating expense.

During 1917 the management of the corporation culled from its accumulation of cards 971 as having become wholly obsolete and sold them as junk, receiving therefor but a very small sum. The designs from which the cards had been made, and which required but a small amount of room to store, were, however, retained. In respect to the remaining sets of designs and cards, approximately 1,500 in number, nothing was done until after the assessments for deficiency taxes were made against the Rhode Island corporation as transferee of the New York corporation's assets.

In the course of the plaintiff's preparation of its defense against these assessments it caused a review, or examination, to be made in respect to the use which had been had by the New York corporation of the remaining designs and cards. The result of this examination disclosed that from 1917 on the orders received by the New York corporation for the manufacture of shoe strap fabric, embodying the designs produced through the use of these cards, had been small and few in number. As a result of this examination Mr. Greene, one of the officers of the plaintiff

corporation who also had previously occupied a like official position in the New York corporation, testified at the trial of this cause as follows: "In 1918 I should say that the obsolescence would hit about 1374 patterns at $23, making some $31,000 or $32,000 of obsolescence." Mr. Greene also testified, in reference to the life and durability of the patterns and cards, as follows: "Q. Mr. Greene, how long did the patterns and cards, according to your experience in the Hamilton Web Company, last? A. The patterns will last indefinitely. The patterns are always good just as long as you want to make that particular arrangement. The cards will last two or three years and if a single card breaks it can be taken out and replaced very simply. It is a very simple repair, a matter of two or three minutes."

Of the total cost for each pattern or design and corresponding set of cards, slightly over 50 per cent. is represented by the cost of making the pattern. Mr. Greene further testified, but without certainty of recollection, that the accumulation of the various sets of patterns and cards on hand at the beginning of 1917 had covered a period from about 1900 on. There is no testimony in regard to the patterns and cards acquired during any one year. There is no testimony in regard to the number which were acquired subsequent to the enactment of the various Federal Income Tax Statutes, during which time the New York corporation had been deducting from its annual returns the total cost of such sets as were acquired during any one year. There is no evidence from which this court could determine what allowance for depreciation or obsolescence for previous years should be taken into account in respect to the cards discarded in 1917 or in respect to the 1374 sets of patterns and cards claimed to have become obsolete in 1918. Instead, the plaintiff now urges that this court should consider the entire cost of the 2,400 sets of patterns and cards as an existing capital item at the beginning of 1917 and allow as a deduction a capital loss, through obsolescence, of the full original cost of 971 sets for 1917 and 1374 sets for 1918. There is in the record sufficient to suggest that, due to the change of styles in shoe manufacture at this time, there was an increased loss through obsolescence. What it was, no one can determine from the record before us. Certain it is that an effort to do substantial justice between the parties could not lead to the conclusion urged by the plaintiff.

■ There is no evidence that the New York corporation, whose tax liability is here involved as the basis of the assessment against the transferee, ever sought to capitalize these expenditures. With the uncertainty before its management as to repeat orders for any one design and considering the relatively short life of the cards involved, the corporation elected to adopt a conservative course of accounting and charge these items to expense. Its action in so doing, with the acquiescence of the government, was presumably within its rights and entirely proper. It is not now within the province of the Rhode Island corporation, as transferee, to make a different election and adopt in respect to the New York corporation's affairs a different method of accounting.

We come now to the remaining questions as to whether the collection of the deficiency taxes owed by the New York corporation for the years 1917, 1918, and 1919 from this plaintiff, as transferee, was barred by limitations. It is conceded that, subject to the effect of any valid waivers or agreements, the time for making assessments in respect to the three returns in question would have expired, by statutory limitations, on April 1, 1923, April 26, 1924, and March 12, 1925, respectively. In January, 1923, however, the corporation duly executed the following so-called unlimited waiver in respect to its return for the year 1917:

"Jan. 23, 1923.

"Income and Profits Tax Waiver

"In pursuance of the provisions of subdivision (d) of section 250 of the Revenue Act of 1921 [42 Stat. 264], Hamilton Web Co. of Hamilton, R. I., and the Commissioner of Internal Revenue, hereby consent to a determination, assessment, and collection of the amount of income, excess-profits, or war-profits taxes due under any return made by or on behalf of the said corporation for the year 1917 under the Revenue Act of 1921, or under prior income, excess-profits, or war-profits tax acts, or under section 38 of the act entitled 'An Act to provide revenue, equalize duties, and encourage the industries of the United States and for other purposes,' approved August 5, 1909 [36 Stat. 112], irrespective of any period of limitations.

"Hamilton Web Co., Taxpayer
"Joseph Warren Greene, Jr.,
"Treasurer,

"By ————
"D. H. Blair, Commissioner
"[Seal  Hamilton Web Company]"

By a subsequent order of the Commissioner of Internal Revenue all unlimited waivers were made to expire on April 1, 1924.

In January, 1924, the corporation executed the following additional waiver in respect to its returns for both the years 1917 and 1918:

"January 17, 1924.

"Income and Profits Tax Waiver

"In pursuance of the provisions of subdivision (d) of section 250 of the Revenue Act of 1921, Hamilton Web Company, of Hamilton, Rhode Island, and the Commissioner of Internal Revenue, hereby consent to a determination, assessment, and collection of the amount of income, excess-profits, or war-profits taxes due under any return made by or on behalf of the said Company for the years 1917 and 1918 under the Revenue Act of 1921, or under prior income, excess-profits, or war-profits tax Acts, or under section 38 of the Act entitled 'An Act to provide revenue, equalize duties, and encourage the industries of the United States, and for other purposes,' approved August 5, 1909. This waiver is in effect from the date it is signed by the taxpayer and will remain in effect for a period of one year after the expiration of the statutory period of limitation, or the statutory period of limitation as extended by any waivers already on file with the Bureau, within which assessments of taxes may be made for the year or years mentioned.

"Hamilton Web Co.
"Joseph Warren Greene, Jr.,
"By ———
"D. H. Blair, Commissioner
"[Seal   Hamilton Web Company]"

As a result of the terms of this waiver, the statutory period within which assessments could be made for these two years would, therefore, expire on April 1, 1925, and April 26, 1925, respectively. No waiver was ever executed by the New York corporation in respect to the return filed March 9, 1920, for the year 1919. It is apparent, therefore, that so far as any waivers are concerned which were executed by the New York corporation no additional tax could be levied against it in respect to the returns for any one of the three years later than April 26, 1925.

While matters stood thus the officers of the New York corporation, and for entirely proper reasons, decided to form a corporation in Rhode Island where its business was being carried on and to transfer to it the assets of the New York corporation. In March, 1924, the Rhode Island corporation was organized, and at the last meeting of the stockholders of the New York corporation held in April, 1924, the following resolution was passed: "Resolved: That this corporation sell and convey to the Hamilton Web Company, a corporation duly incorporated or to be incorporated under the laws of the state of Rhode Island, all its real estate, personal property and other assets of every kind, nature, and description, including its good will, in consideration of the said Hamilton Web Company, Rhode Island corporation, assuming all the debts, obligations and liabilities of this corporation, and issuing to the present stockholders of record of this corporation shares of stock in said Rhode Island corporation of the par value of $100 each, equal in number to the number of shares which they now hold in this corporation, and that the President and Secretary and all other necessary and proper officers are hereby authorized and directed, in the name and in behalf of this corporation to make, execute and deliver to said Hamilton Web Company, Rhode Island corporation, all written instruments requisite or necessary to make the aforesaid conveyance and transfer."

Within a few days thereafter the transfer of all the assets of the New York corporation to the Rhode Island corporation was consummated. The stockholders of the New York corporation surrendered their stock and received in lieu thereof capital stock in the Rhode Island corporation, acquiring the same proportionate interest in the latter as they had previously held in the former. The same business continued to be carried on by the new corporation, which also elected the same officers as had theretofore served the New York corporation. Proper steps were then taken under the laws of New York to dissolve the New York corporation, the certificate of dissolution being filed with the Secretary of State of New York on June 30, 1924.

The General Corporation Law of New York provides in part as follows:

"Upon the dissolution of any corporation, its directors, unless other persons shall be appointed by the legislature, or by some court of competent jurisdiction, shall be the trustees of its creditors, stockholders or members, and shall have full power to settle its affairs, collect and pay outstanding debts, and divide among the persons entitled thereto the money and other property remaining after payment of debts and necessary expenses.

"Such trustees shall have authority to sue for and recover the debts and property of the corporation, by their name as such trustees, and shall jointly and severally be personally liable to its creditors, stockholders or members, to the extent of its property and effects that shall come into their hands." Laws 1909, c. 28 (Consol. Laws, c. 23) § 35.

At no time did the directors, as trustees, take any action to authorize any person or

corporation to act in their behalf or for the dissolved corporation, its creditors or stockholders.

If we could pause here, the disposition of the case would be simple. The tax collected and paid under protest represents a liability incurred by the New York corporation during years long antedating the existence of the present corporate plaintiff. It was assessed long after the expiration of the last waiver either executed or authorized by the New York corporation. The difficulty arises from subsequent doings of the officers of the Rhode Island corporation whose position throughout the entire controversy has been treated by the government, not as the taxpayer, but as one liable as transferee of the assets of the taxpayer.

Beginning with October 22, 1924, a series of additional instruments was executed, the effect of which presents the real issue in this case. These instruments are in form the usual waivers used by the Commissioner during this period. The one executed on the aforementioned date is headed "Hamilton Web Co., a corporation, organized under the laws of the State of New York." It purports to waive all statutory limitations as to the time within which assessments of additional tax may be made for a period of one year from the date of its execution in respect to the New York corporation's liability for federal taxes for the year ending December 31, 1919. The instrument is signed "Hamilton Web Co. By Joseph Warren Greene, Presdt.," and plainly bears the seal of the Rhode Island corporation. This seal, as is customary in this state, also plainly indicates the year of incorporation as 1924.

The next instrument executed purports also to be a waiver for one year relating to the returns of the taxpayer for two years 1917 and 1918. This instrument is dated December 20, 1924. It is executed in the same manner as the previous instrument and bears the seal of the Rhode Island corporation. Directly under this seal, upon this and all the subsequent waivers, is a legend or direction, the last phrases of which are as follows: "In addition to which the seal, if any, of the corporation must be affixed."

The next instrument in order is a similar waiver executed August 24, 1925, in respect to the taxpayer's return for 1917. It is executed in the same manner, plainly bearing the seal of the Rhode Island corporation and embodying the same directory legend at the foot in respect to affixing the corporate seal. This instrument was accompanied by two others of like tenor, executed in the same manner and on the same date but purporting to relate to the taxpayer's returns for 1918 and 1919 respectively.

Nowhere in the record is there any evidence that the Commissioner was not aware that the tax liability under consideration was that of the New York corporation. Nevertheless, he accepted waivers plainly executed by the Rhode Island corporation. Throughout the record there are affirmative indications that the Commissioner dealt with the Rhode Island corporation as the transferee of the older corporation's assets.

So far as can be found from the exhibits introduced, no claim of a deficiency, formal or informal, was ever asserted by the Commissioner until some months after April 26, 1925.

What then is the legal effect of these instruments executed during 1924 and 1925 after the dissolution of the New York corporation by an officer of, and under the seal of, the Rhode Island corporation? It is well settled that if the period fixed by statute within which an assessment could be made against the taxpayer has elapsed and the government relies upon alleged waivers or agreements extending that period, the burden is upon the government to establish such waivers or agreements as valid. White Eagle Oil & Refining Co. v. Commissioner, 19 B. T. A. 185; Godfrey v. Commissioner, 18 B. T. A. 775.

Apparently at no time during the travel of the present controversy has any contention been made that the agencies of the government were either deceived by or unaware of the character of these waivers. At the time the matter was before the Board of Tax Appeals, it was pointed out by that Board, acting upon a motion filed by counsel for the Commissioner, that the petition before it was brought, not by the taxpayer, the New York corporation, but by the Rhode Island corporation organized several years after the accrual of the taxes involved. The Board, in dismissing the matter, said in part as follows: "Without deciding the issue relative to the validity of the waivers involved in this proceeding, we deem it proper to point out that if we were considering the merits of the case we would be constrained to hold, upon the facts of record and the authority of prior Board decisions, that the waivers executed by the Rhode Island corporation are invalid."

In support of this statement by the Board, which of course must be viewed in the nature of dicta, several earlier decisions were cited, among those that in the case of Angier Corporation v. Commissioner, 17 B. T. A. 1376.

The government now contends that the above-stated view of the Board no longer has significance because of the decision of the Circuit Court of Appeals, First Circuit, in the Angier Case, 50 F.(2d) 887. In that case the court held that a corporate officer, acting as a de facto officer, has authority to sign waivers extending the period of limitations in respect to the determination, assessment, and collection of income taxes, and that in executing such waivers and affixing the seal of the corporation thereto he is but taking a step in the furtherance of the final liquidation of the corporation's affairs. This decision has been much relied upon by the government. It will be noted, however, in the facts of the Angier Case that the waivers in question were signed in the name of the taxpayer, the dissolved corporation, and bore the corporate seal of the taxpayer. They were not, as here, executed by the transferee sought to be charged.

■ Throughout the early stages of the consideration of plaintiff's tax liability, repeated reference is made by the government agents in their reports to the Commissioner to the many years that the taxpayer has been in business and its very conservative method of account and operation prior to March 1, 1913. In the affidavit, Defendant's Exhibit R, submitted to the Commissioner June 4, 1924, signed by Joseph Warren Greene, it is specifically set forth that the taxpayer is a corporation organized under the laws of New York. Yet the Commissioner, after the expiration of the five-year period fixed by the statute and the expiration of the additional one year covered by the two waivers signed by the taxpayer, thereafter accepts the waivers signed over the seal of the transferee Rhode Island corporation. If the Commissioner erred in the acceptance of these later waivers and erred in his judgment as to their sufficiency, it was solely an error of law and was in no way attributable to any fraud or concealment by the taxpayer or transferee. Many times taxpayers err similarly, yet are held to the legal consequences of their error. I see no reason why the government should not be held to a like compliance with its own laws and regulations. See Gott v. Live Poultry Transit Co., 17 Del. Ch. 288, 153 A. 801.

In pressing its argument that the plaintiff is bound by the waivers signed in the name of the Rhode Island corporation, the government contends that the courts are now inclined to disregard such corporate changes as are involved in the instant case in tax cases where successors or transferees are seeking to avoid the payment of a tax or transferee assessment.

The cases cited by the government in support of its contention, which is predicated wholly upon the identity of interest of the same persons in the Rhode Island corporation, do not support its position. While many of the decisions indicate a definite inclination on the part of the courts in tax cases to prevent a party from gaining any advantage through fraudulent acts or misleading representations, I find no case where these factors are absent that the courts have been willing to set aside the well-established principles of corporation law and disregard the legal significance of separate corporate entities. Perhaps the closest approach to so doing, among recent decisions, may be found in the decision of the court in the case of Phillips v. Lyman H. Howe Films Co. (C. C. A.) 33 F.(2d) 891, 892. This was a decision by the Circuit Court of Appeals for the Third Circuit. In that case Buffington, J., speaking for the court, said: "Regarding substance and not mere corporate form, it is clear to us that the filing of the required statutory waiver was the right of the shareholders of the merged corporation."

It will be noted in connection with this decision, however, that it was a case in which those who paid the tax were permitted to prevail. The court also was dealing with a situation where the predecessor and the new corporation were both entities organized under the laws of the same state, Pennsylvania. It is clear, too, that the court regarded the new corporation as in the relation of taxpayer to the government only because what was done in connection with the merger was a permissible proceeding specifically provided for under the law of that state.

In the case of Brighton Packing Co. v. Butchers' S. & M. Ass'n, 211 Mass. 398, 97 N. E. 780: "Defendant leased to a South Dakota corporation a slaughterhouse for a term of years, and thereafter the organizers of the corporation organized a corporation under the laws of Maine by the same name for the same purpose and having the same officers and stockholders, the stock of the new corporation being issued to the stockholders of the old company in exchange for their shares, and the South Dakota corporation transferred its property, including the lease, to the Maine corporation without defendant's knowledge, however; and thereafter the president of both corporations, who had also executed the original lease, executed with defendant a modifying lease, affixing the seal of the Maine corporation thereto, but the fact that the modifying lease was executed by the Maine corporation was intentionally concealed from

defendant. Held, that the minds of the contracting parties never met upon the modifying agreement, so that it did not constitute a valid lease, and the fact that defendant had no reason to prefer to contract with one corporation rather than the other was immaterial."

In this case the Massachusetts Supreme Judicial Court, in referring to these facts, said: "These are two distinct corporations, created by the laws of two different states. The powers of each corporation are limited and controlled by the statutes of the state which created it, and it is scarcely conceivable that the statutes of the two states are the same or that the franchises and powers of the two corporations are identical. But if this were so, it would remain true that they are the creation of two different governments, the offspring of different parents, and not only distinct legal entities, but having separate and distinct existences. They could and did make contracts with each other; they might bring suits against each other. They are in no respect the same person."

The court in the case of Amtorg Trading Corp. v. United States (Cust. & Pat. App.) 71 F.(2d) 524, at page 528, in commenting upon the state of the law as to the circumstances under which the courts are justified in disregarding separate corporate entities and examining the interests in them, quoted, with approval, the following: "Hence, we think the rule to apply to such cases is this: Where a corporation is proceeding at law, or where it is asserting a title to property, or the title to property is involved, the corporation is regarded as a person separate and distinct from its stockholders, or any or all of them. But where it is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a recovery, and if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf and for their advantage, the corporation will not be permitted to recover."

■ I hold that the government has here not established the validity of the waivers signed by the Rhode Island corporation. The assessment against the transferee as of the time the same was made in respect to each of the three taxable years in question was, therefore, barred by limitations.

■ The government contends, however, without any showing or claim of fraud on the part of either the taxpayer or the transferee, that the plaintiff is now estopped from questioning the validity of the so-called waivers in question in that the Commissioner, in reliance upon them, continued a reconsideration of the taxpayer's prior liability. It is pointed out also that in the course of this subsequent reconsideration a revision of the tax as originally claimed to be owed from the taxpayer resulted in a substantial reduction of the amount claimed. This, however, is no more of a benefit derived by the plaintiff here than if there had been no waivers involved at all and the Commissioner had continued the consideration of the case with like results and permitted the statutory period to run. No one would seriously contend that if he had done so, even at the request of either the taxpayer or the transferee, that they would be barred from pleading the statute of limitations in defense.

■ While this is a case at law, I know of no case, even in equity in the absence of fraud or concealment, which holds that a party is estopped from setting up a defense where the necessity for the claim of estoppel in order to prevail arises from the errors of judgment of law on the part of the one seeking to claim the benefit of the estoppel. It is a clear case of careless procedure on the part of the parties involved. The plaintiff supplied and the defendant accepted that for which request was made. The parties must be left, and their rights determined, in accordance with the plain legal consequences of their respective doings.

■ It is urged that though a tax be irregularly collected, even if paid under protest, it may not be recovered back if the tax was in fact owed. This contention has no application here. The plaintiff was not the taxpayer and owed no tax as such. It was liable to be proceeded against in manner prescribed by statute as the transferee of assets of the taxpayer. If the tax had become uncollectible as regards the taxpayer, there was no basis for a transferee assessment against the plaintiff. Commissioner of Internal Revenue v. Northern Coal Co. (Same v. C. H. Sprague & Son Co.), 62 F.(2d) 742 (C. C. A.).

Let judgment be entered for the plaintiff in the sum of $31,945.93, together with lawful interest thereon. Entry of judgment will be suspended for ten days herefrom to permit settlement of, and entry of exceptions to, findings of fact and conclusions of law.