PARAMOUNT WARRIOR, INC., Transferee of Paramount Pacific, Inc. (formerly Macco Corporation), Transferor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Paramount Warrior, Inc. v. Commissioner
Docket No. 9271-72
United States Tax Court
T.C. Memo 1976-400; 1976 Tax Ct. Memo LEXIS 1; 35 T.C.M. (CCH) 1805; T.C.M. (RIA) 760400; December 30, 1976, Filed William R. Nicholas, Robert K. Burgess, Thomas G. Bost; William C. Bottger, Jr., and Austin H. Peck, Jr., for the petitioner. H. Lloyd Nearing, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent has determined that petitioner is liable as a transferee in respect of the following deficiencies in Paramount Pacific, Inc.,'s Federal income tax liability as follows: Year
Deficiency
1957
$1,038,061.35
1958
14,797.16
1959
9,379.39
1960
64,585.83
The sole issue is the validity of certain agreements extending the period of limitations as against the petitioner, which concedes that it is a transferee within the meaning of section 6901. [1] The parties have agreed to the amount *3 of such transferee liability, if we hold for respondent. FINDINGS OF FACT Macco Corporation (Macco) was a Nevada corporation with its principal office at Paramount, California. For the years 1957, 1958, 1959, and 1960, it filed Federal income tax returns with the District Director of Internal Revenue at Los Angeles, California. Macco and its wholly owned subsidiaries were engaged primarily in the general construction contracting business. On July 1, 1967, its name was changed to Paramount Pacific, Inc. (Pacific) but the business operations were not affected. By the end of September, 1968, Zapata Off-Shore Company (Zapata) had acquired 98 percent of Pacific's issued and outstanding stock. In April, 1969, Zapata incorporated petitioner, Paramount Warrior, Inc., (Warrior) under the laws of the State of Delaware. Warrior has always been a whollyowned subsidiary of Zapata. On September 30, 1969, Pacific and its subsidiaries were merged into Warrior. Petitioner had its principal office in Houston, Texas, at the time of the filing of the petition herein. At some time prior *4 to February, 1963, Macco's tax returns for the years 1954 through 1960 were audited by respondent's agents. Mr. Max Green of the Los Angeles Appellate Division was assigned to review a settlement proposal for these years. On or about July 31, 1963, Macco's return for the year 1961 was audited by Revenue Agent McCullough. The primary question involved in the audit of the 1961 return was the validity of a claimed loss resulting from a joint venture. Portions of this loss were carried back to the taxable years 1957 through 1960. Action on the returns for the years 1957-1961 was delayed by oral agreement (reached during February 1966), pending resolution of the question of this loss, which was being handled by the New York City District Director's office. Prior to the merger, agreements with the respondent (Form 872) were executed in the name of Macco or Pacific which extended the period during which respondent could assert a deficiency for the years 1957-1961. Agreements executed during the period February, 1961, through February 8, 1968, were signed in the name of Macco by Callum MacLeod, vice president of Macco/Pacific, or Henry Diehl, attorney for Macco. Sidney Peizer (Peizer), *5 treasurer of Macco/Pacific signed the last premerger agreements on November 26, 1968, which extended the period of limitations until March 31, 1970. In these agreements, Peizer struck out the name "Macco Corporation" and substituted "Paramount Pacific, Inc. Formerly Macco Corporation." Peizer signed Pacific's Federal income tax returns for 1967 on September 5, 1968, and for the period ending May 31, 1968, on June 12, 1969. Macco's tax returns for the taxable years 1962-1965 were assigned for audit to Revenue Agent Edwin Frank in March, 1966. During this audit, Peizer was responsible for providing the agent with the information requested concerning Pacific's operations. The audit was substantially completed in or about June, 1967, but the final agent's report was not submitted until October, 1969. The delay was due to the investigation of the aforementioned joint venture. Agreements extending the statute of limitations period for the years 1962-1965 were executed on March 14, 1969, by Peizer on behalf of Pacific. The merger of Pacific and its subsidiaries into Warrior was carried out pursuant to the laws of California, Delaware, and Nevada. Under the terms of the merger *6 agreement, the separate existence of Pacific was to cease when the merger became effective, i.e., September 30, 1969; the surviving corporation (Warrior) was to be governed by the laws of the State of Delaware; and the certificate of incorporation and the by-laws of Warrior were to serve as the certificate and by-laws of the surviving corporation. The agreement further provided: On the Effective Date, the Surviving Corporation shall possess all the rights, privileges, powers and franchises as well of a public as of a private nature and be subject to all the restrictions, disabilities and duties of each of the Constituent Corporations, and all and singular, the rights, privileges, and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to each of such corporations on whatever account, as well as all other things or choses in action, or belonging to each of such corporations; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the Surviving Corporation as they were of the respective Constituent Corporations, and the title to any real estate, *7 vested by deed or otherwise in any of the Constituent Corporations, shall not revert or be in any way impaired by reason of the merger; but all rights of creditors and all liens upon the property of any of the Constituent Corporations shall be preserved unimpaired, and all debts, liabilities and duties of the Constituent Corporations shall thenceforth attach to the Surviving Corporation and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it. * * *
6.
Prior to and from and after the Effective Date the Constituent Corporations and Zapata shall take all such action as may be necessary or appropriate in order to effectuate the merger. In case at any time after the Effective Date the Surviving Corporation shall determine that any further conveyance, assignment, or other document, or any further action is necessary or desirable to vest in the Surviving Corporation full title to all properties, assets, rights, or privileges and franchises of any of the Constituent Corporations, the officers and directors of such Constituent Corporations and of Zapata shall execute and deliver all such instruments and take all *8 such action as the Surviving Corporation may determine to be necessary or desirable in order to vest in and confirm to the Surviving Corporation title to and possession of all such properties, assets, rights, privileges and franchises, and otherwise to carry out the purposes of this Agreement. On the day of the merger, Warrior's board of directors held a special meeting. "In order to preserve the good will and continuity of operations of the various constituent corporations," the board resolved that the business operations of each of the constituent corporations would be carried on by a separate division of Warrior, with each division having the same management as the constituent corporation had prior to the merger. Peizer was selected as controller of each of the divisions of Warrior which formerly had been conducted through Pacific and its subsidiaries. He was also elected an assistant secretary of Warrior. On September 26, 1969, Zapata notified the Southwest Service Center of the Internal Revenue Service at Austin, Texas, that certain subsidiaries of Zapata were being merged into Warrior. On October 7, 1969, Zapata notified the Southwest Service Center that Pacific was one *9 of the corporations that was merged into Warrior. In this correspondence, Zapata requested new Employer Identification numbers for each division of Warrior. Subsequent to the merger of Pacific into Warrior, Form 872 agreements were signed by Peizer as treasurer of Pacific: on October 28, 1969, for the years 1962-1965; on December 2, 1969, for the years 1957-1961, extending the period of limitations for these years until February 23, 1971. Additional agreements covering all the foregoing years were signed by Peizer on September 8, 1970, (years 1962-1965), and November 16, 1970, (years 1957-1961), extending the period of limitations for theyears involved herein until November 30, 1971. The latter agreements were signed by respondent on November 19, 1970. These post-merger agreements were prepared by the Internal Revenue Service. No mention was made in the agreements of the fact that Pacific had been merged into Warrior. The corporate name used on these forms and on whose behalf Peizer purported to act was "Paramount Pacific, Inc. (formerly Macco Corporation)." Respondent issued a 30-day letter to Pacific and certain of its subsidiaries for the taxable years 1962-1965 on March 3, 1970. *10 On March 25, 1970, a law firm representing Pacific requested an extension of time for filing a protest. A power of attorney, executed in the name of Pacific and signed by Peizer, as treasurer, was sent by that law firm to respondent on April 7, 1970. Neither the letters nor the power of attorney made any mention of the merger of Pacific into Warrior. On May 26, 1970, the law firm wrote to respondent requesting an additional 15 days in which a protest could be filed. The letter stated in part: The reasons for requesting the extension are as follows. In 1968 the above corporations [including Pacific] were acquired by Zapata-Off Shore Company. As a result, many of the personnel who were present at the time the events took place which are covered by the Revenue Agents' Reports are no longer with the Company. Drafts of the protests in all of the cases have been prepared and have been submitted for review to the corporate offices of Zapata-Off Shore Company which is located in Houston, Texas. A meeting with the tax counsel for Zapata has been set for the week of June 1, 1970. The protest, subsequently filed on or about June 15, 1970, and covering the taxable years 1962-1965, was *11 in the name of "Paramount Pacific, Inc. (formerly Macco Corporation)," and was signed by Peizer. No mention was made therein of the merger of Pacific into Warrior. On June 11, 1970, Zapata filed its consolidated return for the fiscal year ending September 30, 1969. The return included a copy of the merger agreement between Pacific and Warrior. Warrior executed a transferee agreement prepared by respondent (Form 2045), which was received by respondent's Field Audit Group in Long Beach, California, on August 10, 1970. The transferor specified in this agreement was Pacific and its subsidiaries. L. C. McIntyre, assistant treasurer, signed the agreement for Warrior. Under the agreement, Warrior agreed to pay all taxes owed by Pacific for the years 1966-1968. This transferee agreement was obtained by Robert Shellabarger, a revenue agent for respondent, who was handling the audit for those years. He sought these agreements when he learned, on or about June 17, 1970, that Pacific had merged into Warrior the previous September. Shellabarger did not seek such agreements for the years 1957-1965 because he had no jurisdiction over those years, although he was aware that several of *12 those years were the subject of audit and that Green had jurisdiction thereof. Shellabarger did not discuss the Pacific case with Green until on May 20, 1971, at which time he informed Greem of the merger.
A transferee agreement, prepared by respondent and executed by Warrior, in which it agreed to pay any taxes owed by Pacific for the years 1954-1965, was received by the Appellate Division of respondent's Los Angeles office on September 13, 1971. The agreement was signed by Lamar C. McIntyre, assistant treasurer of Warrior. In response to a 30-day letter issued on or about September 21, 1971, to Pacific and its subsidiaries "as transferor" in respect of the years 1966 and 1967, a protest was filed by the aforementioned law firm on February 17, 1972, in the name of "Paramount Pacific, Inc., and Subsidiaries, Transferor (formerly Macco Corporation)," and was signed by Peizer as vice president and trasurer of Warrior, transferee. Warrior executed agreements (Form 977), extending the period of limitations against it as transferee of Pacific on May 31, 1972. The agreements covered the years 1957-1961, and were signed by Lamar C. McIntyre, assistant treasurer of Warrior. The agreements *13 provided: if prior to the execution of this agreement by Paramount Warrior, the applicable period of limitation for assessment of income tax for the above mentioned taxable year against Paramount Warrior as transferee has expired, then this agreement shall be of no force and effect. The notice of liability for the years 1957-1961 was mailed to Warrior as transferee of the assets of Pacific on September 27, 1972. OPINION The liability of petitioner (Warrior) for the deficiencies asserted herein is based upon its conceded status as transferee of the assets of Pacific. [2] Section 6901(a). The period of limitations against a transferee is one year after the expiration of the period of limitations for assessment against the transferor. Section 6901(c). See also section 6501. Although the period of limitations can be extended by agreement of the respondent and the transferee, such an extension must be executed prior to the time the period of limitations would otherwise expire. Section 6901(d). *14 The sole issue before us is the extent to which the various agreements involved herein extended the period of limitations under sections 6501(c)(4) and 6901(d) for the years involved, namely, 1957-1960. Resolution of this issue requires the answers to the following questions: (a) the authority of Peizer to act on behalf of Pacific (which depends upon the effect of the merger of Pacific into Warrior on the continued existence of Pacific) and/or Warrior after the merger [3] and on whose behalf Peizer was acting on the particular occasions and (b) if the Court finds that Peizer did not have the requisite authority, whether Warrior is nevertheless estopped to deny the validity of the agreements. Agreements executed by Pacific prior to the merger extended the period of limitations to March 31, 1970. In the absence of valid postmerger consents, the period of assessment against Warrior as transferee would have expired on March 31, 1971. The notice of deficiency mailed on September 27, 1972, would thus be untimely. Three sets of agreements *15 were executed after the merger. Two were agreements signed by Peizer in the name of Pacific on December 2, 1969, and November 16, 1970. The third set was executed by Warrior as transferee on May 31, 1972. By their explicit terms, the third set was to be given effect only if the period of limitations had not expired prior to the latter date. This period would not have expired only if the two earlier sets of agreements were valid. Their validity in the first instance depends upon the extent of Peizer's authority as outlined in question (a) above. Authority to act on behalf of a corporation in tax matters is determined by state law. Sanderling, Inc.,66 T.C. 743, 750 (1976). Since Pacific is a Nevada corporation, the authority of Peizer to act on its behalf is determined under the laws of that state. The provisions of the Nevada Revised Statutes (1973) pertinent to this case are set forth in the footnote below. [4] Under these provisions, the separate existence of Pacific after it was merged into Warrior ceased when all of the requisite formalities of the merger had been completed, at which time Warrior as the surviving corporation took all the rights and assumed *16 obligations of the constituent corporation as its own. Lamb v. Leroy Corp.,85 Nev. 276, 454 P. 2d 24 (1969). *17 We are satisfied that, upon the merger, Pacific was so "drowned" into Warrior (see Helvering v. Metropolitan Edison Co.,306 U.S. 522 (1939)), which became primarily liable for the obligations of Pacific under Nevada law, that no one had any authority to act thereafter on behalf of Pacific in respect of the tax liabilities involved herein. [5]Commissioner v. Oswego Falls Corp.,71 F.2d 673 (2d Cir. 1934), affg. 26 B.T.A. 60 (1932). Cf. Skaneateles Paper Co.,29 B.T.A. 150, 157 (1933). The fact that Pacific continued as a division of Warrior after the merger does not provide a basis for clothing it with the attributes of a separate legal entity. The postmerger status of Pacific, which ceased to exist on the merger date, is to be sharply distinguished from that of a dissolved corporation during the statutory winding-up period; in such situations, we have sustained the validity of agreements executed by representatives of the dissolved corporation, at least where they did not extend the period of limitations to a date beyond the end of the winding-up period. E.g., Associates Investment Co.,59 T.C. 441 (1972). *18 Compare United States v. Adams Bldg. Co., Inc.,531 F. 2d 342 (6th Cir. (1976), and Rowan Drilling Co.,44 B.T.A. 189, 193-195 (1941), affd. on other issues 130 F. 2d 62 (5th Cir. 1942), with D. J. Gay,31 B.T.A. 580 (1934), and Union Shipbuilding Co.,43 B.T.A. 1143, 1145 (1941). *19 Nor are we able to conclude that Peizer had any apparent authority to act on behalf of Pacific after the merger. The sina qua non of apparent authority is that there be a situation in which actual authority could exist. But the merger terminated Pacific's existence and after that date it could not confer any authority on anyone. Such being the case, there could be no apparent authority vested in Peizer on its behalf and respondent's position herein would have to rest on the extent to which Warrior might be estopped to deny the validity of the agreements executed in Pacific's name. Cf. Restatement, Agency 2d Series, sec. 7, comment a, sec. 8, and sec. 120, comments a and c. See p. 25 et seq., infra. The holding in Popular Library, Inc.,39 T.C. 1092 (1963), heavily relied upon by respondent, was predicated upon a New York statute which did not contain the language of the Nevada statute involved herein; the latter clearly specifies that when the merger is effective the "separate existence of all the constituent corporations * * * shall cease." [6] In all the other cases cited by respondent, a principal was in existence upon whose behalf the agreements *20 involved could properly be executed. Nor can we accept respondent's argument that Nev. Rev. Stat., sec. 78.500 (1973) (see footnote 4, supra), encompasses authority in Peizer to execute the post-merger agreements. The merger agreement contains provisions of similar import in paragraphs four and six, pp. 7-8, supra. We think these provisions are limited to the power to take actions necessary to enable the surviving corporation to succeed fully to the assets of the constituent corporations. Moreover, it seems clear that this statute and the provisions of the merger agreement were intended for the benefit of Warrior, as the surviving *21 corporation, and did not confer any independent rights on third parties.
Respondent also suggests that a "proceeding" was pending herein within the meaning of section 78.525 of the Nev. Rev. Stat. (1973) (see footnote 4, supra). It is sufficient to note that the circumstances do not achieve the level necessary to bring the instant case within our holding in Ann C. Field,32 T.C. 187 (1959), affd. per curiam 286 F.2d 960 (6th Cir. 1960). In that case, various activities (including the filing of agreements extending the period of limitations, the issuance of 30-day letters, the giving of a waiver of restrictions on collection and assessment, and the submission of an offer in compromise together with the tender of a check in payment) were held to constitute a proceeding within the meaning of the applicable provision of Michigan law. The bulk of these activities, however, occurred prior to the expiration of the post-dissolution period of continuance, i.e., while the transferor was still in existence. By way of contrast, the only activities herein, which occurred prior to the effective date of the merger on September 30, 1969, were the filing of agreements *22 extending the period of limitations to March 31, 1970. No further activities with respect to the taxable years involved herein, other than the execution by Peizer of a set of agreements extending the period of limitations on December 2, 1969, took place between those two dates. [7] Under the foregoing circumstances, we conclude that there was no proceeding pending within the meaning of the Nevada statute; the mere execution of the December 2, 1969, agreements was not enough. Wheeler's Peachtree Pharmacy, Inc.,35 T.C. 177 (1960). Respondent, at trial, specifically renounced any argument that *23 the post-merger agreements extending the period of limitations, which were executed by Peizer in the name of Pacific, might be deemed to have been executed on behalf of Warrior in respect of the primary liability which devolved upon the latter by virtue of the merger. Compare Phillips v. Lyman H. How Films Co.,33 F. 2d 891 (3d Cir. 1929), with Union Shipubilding Co.,supra. See also Lehn & Fink Products Corp.,7 T.C. 287, 315 (1946), affd. per curiam 165 F.2d 207 (3d Cir. 1948). We note in passing, however, that, even if we were to hold that Peizer had express or apparent authority to act on behalf of Warrior in signing the post-merger agreements, the period of limitations on Warrior's primary liability would not have been extended beyond November 30, 1971. Respondent would have been required to issue his deficiency notice prior to that date.He would not be able to rely on the agreements to extend Warrior's direct liability and then utilize them to support a claim for another year under section 6901 to impose transferee liability. Commissioner v. Oswego Falls Corp.,supra; Skaneateles Paper Co.,supra. *24 In short, if respondent is to prevail in the instant case, he must do so on the basis of estoppel and it is to this question that we now direct our attention. Estoppel is an affirmative defense. Rule 39, Tax Court Rules of Practice and Procedure. As such, the burden of proof is on the respondent.Rule 142(a). The essential elements of estoppel include -- (1) conduct, acts, language, or silence amounting to a misrepresentation or a concealment of the existence of a material fact; (2) the truth concerning that fact must be unknown to the other party who claims the benefit of the estoppel; (3) the party claiming the benefit must have relied upon the conduct, acts, language, or silence, of the other party and must have been led to act upon the words or conduct of the other. [Tide Water Oil Co.,29 B.T.A. 1208, 1218-1219 (1934).] Initially, we note that we are not concerned with the issue of whether Warrior is estopped from denying that the agreements executed by Peizer were sufficient to bind it in respect of the primary liability devolving upon it by virtue of the merger. Not only does respondent make no contention in this regard, but the period of limitations *25 for the assessment of the deficiencies against Warrior on the basis of such liability would have expired by the time the deficiency notice herein was issued. See p. 25, supra. Moreover, we note that we do not have a situation where respondent was totally in the dark as to the fact that Pacific had been merged until after the critical agreements were executed.Cf. Aurore B. Benoit,25 T.C. 656 (1955), affd. on this issue 238 F. 2d 485, 494 (1st Cir. 1956). As our findings of fact show, respondent had such knowledge and the question is whether that knowledge was sufficient to preclude respondent from claiming that Warrior is estopped from denying that the agreements executed by Peizer in the name of Pacific consstituted valid extensions of the period of limitations as against Pacific. To answer this question, we find that we need only consider the validity of the agreements signed by Peizer on November 16, 1970, which extended the period of limitations until November 30, 1971; the latest extension date under previous agreements was February 28, 1971, which date was more than one year prior to the date of issuance of the deficiency notice herein. *26 To what extent can it be said that respondent had knowledge of the merger prior to November 9, 1970, the date he signed the agreements? By that time, respondent's Southwest Service Center in Austin, Texas, had been notified of the merger in connection with a request for an employer identification number and Zapata had filed its consolidated return with respondent, in which a copy of the merger agreement was included. There is conflicting testimony of Peizer and Revenue Agent Frank of respondent's Long Beach, California, office, who was assigned to audit the returns of Pacific and its subsidiaries for the years 1962 through 1965, as to whether the latter was informed of the merger on October 28, 1969. On or about June 17, 1970, Revenue Agent Shellabarger of respondent's Long Beach, California, office was informed of the merger; Shellabarger was assigned to conduct an audit of Pacific and its subsidiaries for years subsequent to those involved herein, but he was aware of the audits of Pacific for prior years. On or about August 10, 1970. respondent received via Shellabarger a Form 2045 executed by Warrior in which it agreed that it was a transferee of Pacific and its subsidiaries *27 in respect of any Federal income tax liabilities of the latter for the years 1966 and 1967 and the period ending May 31, 1968; this agreement made no provision for extending the period of limitations. On September 16, 1970, respondent received, also via Shellabarger, the resolution of the board of directors of Warrior authorizing the execution of said Form 2045. Shellabarger did not discuss his audit of Pacific with Green of respondent's Los Angeles appellate staff until May 20, 1971. We find it unnecessary to decide whether the notification of the merger in the correspondence with respondent's Southwest Service Center or in Zapata's consolidated return constituted sufficient knowledge on the part of respondent. Similarly, we need not resolve the conflict between the testimony of Peizer and that of Frank. The cold, hard fact is that by June 17, 1970 respondent knew of the merger via Shellabarger and at that time agreements existed which, assuming their effectiveness, extended the period of limitations against Pacific until February 28, 1971. Respondent thus had ample time -- more than eight months -- to obtain further extensions from Warrior either in respect of its primary *28 liability (see pp. 24-25, supra) or its transferee liability. This it did not do until June 19, 1972, when it obtained an extension of the period of limitations from Warrior in respect of its transferee liability and expressly conditioned on the nonexpiration of the applicable period of limitations. This was well beyond one year after the February 28, 1971 date specified in the December 2, 1969, agreements executed by Peizer in the name of Pacific. Respondent's position can be sustained only if we conclude that he should not be charged with Shellabarger's knowledge because Shellabarger was concerned with years other than those involved herein and that it was not until Green received knowledge of the merger on May 20, 1971, that the bar of estoppel against Warrior was lifted. We are not prepared so to conclude. Shellabarger knew that prior years of Pacific were under audit. Moreover, although Shellabarger was in Long Beach and Green was in Los Angeles, they were both in the same jurisdiction in respondent's organizational structure. We are satisfied that respondent had a reasonable opportunity to take timely measures to protect the fisc and that his failure to do so was not *29 due to reliance on the conduct of Peizer ( Union Shipbuilding Co.,43 B.T.A. at 1146-1147), but due to the failure of his representatives to coordinate their activities. Finally, we think that respondent's attempt to insulate himself against his sources of knowledge other than via Green is, to say the least, disingenuous in view of his reliance on the relations between Peizer, petitioner's legal representative, and respondent's other representatives in order to establish Peizer's authority to act on behalf of Pacific. At the very least, respondent has failed to carry his burden of proof. What happened in this case is that respondent's representatives made a mistaken legal judgment as to the sufficiency of the agreements he had on hand. This is insufficient to satisfy the requirements of estoppel. Hamilton Web Co. v. Page,8 F. Supp. 626 (D.R.I. 1934); Elizabeth Lewis Saigh,36 T.C. 395, 423 (1961); Manhattan Building Co.,27 T.C. 1032, 1042 (1957). Respondent's reliance on Illinois Addressograph Manufacturing Co.,31 B.T.A. 498 (1934), is totally misplaced. In that case, the transferor corporation *30 was the petitioner and was still in existence. It sought on technical grounds to avoid agreements executed on its behalf and it was held estopped from so doing. Here the question is whether the petitioner should be estopped from denying liability as transferee in respect of the liabilities of another, namely, the transferor, at least where the respondent had the opportunity to protect himself against his failure to apply a proper legal interpretation as to the existence of Pacific and its liability for the deficiencies herein. Cf. Tide Water Oil Co.,29 B.T.A. 1208, 1218-1225 (1934). As reluctant as we are to allow a taxpayer to escape liability as a result of technicalities, we conclude that the deficiencies involved herein are barred by the statute of limitations. Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated.↩
2. At trial, respondent expressly renounced any claim against Warrior on the basis that it became primarily liable by virtue of the merger of Pacific into it. See p.24, infra.↩
3. Petitioner concedes that Peizer was authorized to act on behalf of Pacific before the merger and on behalf of Warrior after the merger.↩
4. Sec. 78.495 Status, rights, liabilities and privileges of surviving or consolidated corporations following merger or consolidation.
1. When an agreement of merger, or consolidation, or a certificate of ownership and merger has been signed, acknowledged and filed, as required by this chapter, for all purposes of the laws of this state the separate existence of all the constituent corporations, except that of the surviving corporation in case of merger, shall cease, and the constituent corporations shall thereupon be merged into the surviving corporation, in the case of merger, or shall become the consolidated corporation, in the case of consolidation, and shall possess all the rights, privileges, powers and franchises as well of a public as of a private nature, and be subject to all the restrictions, disabilities and duties of each of the constituent corporations so merged or consolidated, and all and singular, the rights, privileges, powers and franchises of each of the constituent corporations, and all property, real, personal and mixed, and all debts due to any of the constituent corporations on whatever account, as well for stock subscriptions as all other things in action or belonging to each of the constituent corporations, shall be vested in the surviving or consolidated corporation. 2. All property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or consolidated corporation as they were of the several and respective constituent corporations, and the title to any real or personal property, whether by deed or otherwise, vested in any of the constituent corporations, shall not revert or be in any way impaired by reason hereof; provided: (a) That all rights of creditors and all liens upon any property of any of the constituent corporations shall be preserved unimpaired, limited in lien to the property affected by such liens immediately prior to the time of the merger or consolidation, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to the surviving or consolidated corporation and may be enforced against it to the same extent as if the debts, liabilities and duties had been incurred or contracted by it; and * * *
Sec. 78.500Power of directors and officers of constituent corporations to execute necessary instruments of title after merger or consolidation. If at any time the surviving or consolidated corporation shall deem or be advised that any further grants, assignments, confirmations or assurances are necessary or desirable to vest or to perfect or confirm of record or otherwise in such surviving or consolidated corporation the title to any property of any constituent corporation, the officers or any of them and directors of such constituent corporation may execute and deliver any and all such deeds, assignments, confirmations and assurances and do all things necessary or proper so as to best prove, confirm and ratify title to such property in the surviving or consolidated corporation or to otherwise carry out the purposes of the merger or consolidation and the terms of the agreement of merger or consolidation or both. The surviving or consolidated corporation shall have the same power and authority to act in respect to any debts, liabilities and duties of the constituent corporations as the constituent corporations would have had, had they continued in existence. Sec. 78.525Effect of merger or consolidation upon pending actions. Any action or proceeding pending by or against any of the constituent corporations may be prosecuted to judgment as if such merger or consolidation had not taken place, or the surviving or consolidated corporation may be substituted in its place. Sec. 78.530 Liability of corporations, stockholders and officers and creditors' rights not impaired by merger or consolidation. The liability of corporations, or the stockholders or officers thereof, or the rights or remedies of the creditors thereof, or of persons doing or transacting business with such corporations, shall not in any way be lessened or impaired by the merger or consolidation of two or more corporations under the provisions of NRS 78.450 to 78.495, inclusive. [Emphasis in body of statutory provisions added.]↩
5. To the extent that the laws of Delaware (8 Del. Code Ann., secs. 253, 259 and 261), the state of incorporation of Warrior, or the laws of California (24 Cal. Ann. Code §§ 4116 and 4124), the state in which Pacific had its principal place of business, may be applicable, our conclusion would be the same. The statutory provisions of those states are substantially the same as those of Nevada. See Heit v. Tenneco, Inc.,319 F. Supp. 884 (D. Del. 1970), and Damon Alarm Corp. v. American District Telegraph Co.,304 F. Supp. 83, 84 (S.D.N.Y. 1969), in respect of the Delaware provision and J. C. Peacock, Inc. v. Hasko,196 Cal. App. 2d 353, 16 Cal. Reptr. 518 (2d Dist. Ct. App. 1961) and 184 Cal. App. 2d 142↩, 7 Cal. Reptr. 490 (2d Dist. Ct. App. 1960), in respect of the California provision.
6. Moreover, Popular Library, Inc.,39 T.C. 1092 (1963), implies that the surviving corporation did not become directly liable for the debts of the merged corporation. During the taxable years involved, the applicable New York statute did provide for such liability. See N.Y. Stock Corp. Law, sec. 85, subhd. 2 (McKinney 1951), but this provision was not in existence at the time Irvine v. New York Edison Co.,207 N.Y. 425, 101 N.E. 358↩ (1913), relied upon by this Court, was decided.
7. On March 3, 1970, 30-day letters were issued to Pacific with respect to the taxable years 1962 through 1965 (years which are not involved herein) and a request for extension of time to file a protest with respect to those years was submitted under date of March 25, 1970. Neither a Revenue Agent's report nor a 30-day letter with respect to the years involved herein was issued at that time and there is no evidence in the record that any notices or reports were issued as to the years involved herein prior to the issuance of the deficiency notice on September 27, 1972.↩